Robert K. Shelquist, MN #21310X
Karen H. Riebel, MN #0219770
Rebecca A. Peterson, CA #241858
Stephen M. Owen, MN #0399370
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:   (612) 339-6900
Facsimile:    (612) 339-0981
rkshelquist@locklaw.com
khriebel@locklaw.com
rapeterson@locklaw.com
smowen@locklaw.com

*Additional Counsel Listed in Signature Block*

**Attorneys for Plaintiff**

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Robel Ghebrehiwet, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        vs.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware corporation; ROBINHOOD SECURITIES, LLC, a Delaware corporation; and ROBINHOOD MARKETS, INC., a Delaware corporation,<br><br>        Defendants. | Case No. **'21CV214  AJB  RBB**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1.  **Violation of the Consumer Legal Remedies Act – Cal. Civil Code §§ 1750** *et seq.*<br>2.  **Breach of Fiduciary Duty**<br>3.  **Violation of Business & Professions Code §§ 17200,** *et seq.*<br><br>JURY TRIAL DEMANDED |

- 1 -

Plaintiff Robel Ghebrehiwet ("Plaintiff"). by and through his attorneys, brings this class action lawsuit against Defendants Robinhood Financial LLC; Robinhood Securities, LLC; and Robinhood Markets, Inc. ("Defendants" or "Robinhood"), on behalf of himself and all others similarly situated and alleges, upon personal knowledge, information, belief, and the investigation of his counsel.

## NATURE OF ACTION

1.    Founded in 2013, Robinhood is a multi-billion online brokerage firm and website investment service that places stock trade orders on behalf of users like Plaintiff and Class members. According to its website, Robinhood is on a "mission to democratize finance for all" with the belief that "the financial system should be built to work for everyone." (About Us, ROBINHOOD (2021), https://robinhood.com/us/en/about-us/ (last visited January 29, 2021). The average age of Robinhood customer is 28-41, and half of Robinhood's customers do not have any experience in securities trading.

2.    Robinhood touts "commission-free" trading, does not require customers to maintain a minimum account balance, and allows customers to engage in one-click trading with simple access to complex investment products. As such, Robinhood encourages its customers to make frequent trades, as Robinhood is paid more if its customers complete more trades.  During the first three months of 2020,

Robinhood users traded nine times as many shares as E-Trade customers and 40 times as many shares as Charles Schwab customers.

3.    Robinhood is subject to state and federal securities laws, and also owes a duty to its customers to obtain the most favorable trade terms and prices possible, *i.e.*, the duty of "best execution." This duty requires Robinhood to consider price, order size, and trading characteristics of the security, as well as potential for price improvement. The duty of best execution also requires Robinhood to regularly and rigorously review the quality of its customer order executions.

4.    From September 1, 2016, through June 16, 2020, Robinhood breached its duty of best execution and its duty of loyalty by abusing a practice in which it negotiated and received "payments for order flow" (PFOF) at four times the industry standard from the principal trading firms through which it routed its customers' orders. In turn, these trading firms would recoup their payments to Robinhood by providing Robinhood customers, including Plaintiff and the Class, less price improvement[1] on their trades or no price improvement at all. In other words,

---

[1] "Price Improvement" is a phenomenon that occurs when an investor order receives an execution at a price superior to the best available quotation on the public quotation feed at that time. Stated differently, a price improvement means executing a "buy" order at a price lower than the lowest prevailing offer, or executing a "sell" order at a price higher than the highest prevailing bid. Price Improvement creates a financial benefit to the investor, as the investor receives a better price than he or she would have received had the order been executed at the national best bid and offer on the public quotation feed.

Robinhood explicitly offered to accept less price improvement for its customers from principal trading firms, in exchange for receiving a higher rate of payment for order flow for itself. Thus, while Robinhood reaped huge profits from these arraignments, Plaintiff and the Class suffered harm as they received inferior execution prices than they otherwise would have received.

5.     Robinhood did not disclose that it generated most of its revenue from these PFOF transactions, and did not disclose their negative impact on its customers' trades during this period. Rather, Robinhood affirmatively concealed the PFOF it received and the corresponding poor price improvement passed through to its customers.

6.     Robinhood's material omissions, misrepresentations, and concealment of its PFOF arrangements and the inferior execution prices they caused was a breach or Robinhood's fiduciary duty to Plaintiff and the Class, California's Consumer Legal Remedies Act, Civil Code §§ 1750, *et seq.*; and California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*

7.     Plaintiff seeks damages and restitution on behalf of himself and the class.

**JURISDICTION AND VENUE**

8.     This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(a) because the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and this is a class action

in which there are numerous Class members who are citizens of states different from Defendants.

9.     This Court has personal jurisdiction over Defendants, who are citizens of California, and conduct business in California, including the Southern District, and a substantial portion of the acts complained of herein took place in California.

10.     Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Plaintiffs' cause of action arose in this district.

## PARTIES

11.     Plaintiff Robel Ghebrehiwet is an adult citizen of California and resides in San Diego County.  Plaintiff is 33 years old and is therefore within Robinhood's target market. At all times material hereto, Plaintiff acquired the Robinhood mobile phone application and utilized it to acquire, trade and hold securities in California. On or around October 2019, Plaintiff created a Robinhood account, and in February 2020, used Robinhood's brokerage services to complete his first trade. Since then, Plaintiff has executed hundreds of trades, including numerous limit orders and options trading.  Plaintiff chose to use Robinhood because, among other reasons, he believed that Robinhood achieved best execution on client trade orders. Plaintiff relied on Robinhood's represented compliance with its duties of best execution and that all investment transactions would be made in compliance with state and federal law as stated in Robinhood's Customer Agreements, and Plaintiff reasonably

expected Robinhood would comply with its duty of best execution, duty of undivided loyalty to him, duty to fully disclose to him all material facts, duty to refrain from acting adverse to his best interests, and duty to act in good faith. Plaintiff did not know about Robinhood's PFOF arrangements and their adverse effect on his trade execution prices. Plaintiff could not have learned from any publicly available source how much price improvement he lost on his orders as a result of Robinhood's actions. Had Plaintiff known that Robinhood had negotiated substantial PFOF for itself and therefore diminishing the execution quality of his trades, Plaintiff would not have utilized Robinhood's brokerage services. As a result of Robinhood's PFOF arrangements and breach of its duty of best execution, Plaintiff incurred losses on all trades he executed during the Class Period. Plaintiff was also injured because Robinhood's public misrepresentations and poor execution quality impugned the integrity of the trade executions by, among other things, adversely affecting the prices he and the Class members received on their investments. Plaintiff did not know of Robinhood's PFOF arrangements, their adverse effect on the price improvements realized on his trade orders, and that Robinhood was not fulfilling its best execution duties on his behalf, until such facts became publicly available. The amount of Plaintiff's losses can be determined through documents in Robinhood's possession and expert analyses of same.

12.     Defendant Robinhood Markets, Inc. is a financial service holding company incorporated in Delaware with its principal place of business located at 85

Willow Road, Menlo Park, CA 94025. It is the holding company for Defendants Robinhood Financial LLC and Robinhood Securities, LLC. Defendant Robinhood Markets, Inc. is a named party to the Robinhood Terms & Conditions Agreement governing Robinhood's website and mobile applications. Defendant Robinhood Markets, Inc. facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class members and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on their trade orders.

13.     Defendant Robinhood Financial LLC is a Delaware corporation with its principal place at 85 Willow Road, Menlo Park, California 94025. It is a wholly-owned subsidiary of Robinhood Markets, Inc. and an affiliate of Defendant Robinhood Securities, LLC.  Robinhood Financial, LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial LLC, acts as an introducing broker-dealer, offering brokerage services to retail investors and allowing customers to open online accounts and electronically deposit funds. It is a named party to the Robinhood Terms & Conditions Agreement governing Robinhood's website and mobile applications. It is also a party to the Robinhood Customer Agreements, governing the purchase, sale, or carrying of securities or contracts and/or relating thereto and/or the borrowing of funds. Defendant Robinhood Financial LLC facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class

members and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on their trade orders.

14.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly-owned subsidiary of Defendant Robinhood Markets, Inc. and a registered as a broker-dealer with the SEC and full service securities firm. Once a customer creates an account with Robinhood Financial LLC, Defendant Robinhood Securities is the custodian of customers' finds and the securities customers purchase. Defendant Robinhood Securities services customer accounts; executes, clears, and settles customer trades; prepares and distributes customer account statements and trade confirmations; and extends credit to customer margin accounts. It is a party to the Robinhood Customer Agreements governing the purchase, sale, or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through it. Defendant Robinhood Securities, LLC facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class members and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on trade orders.

## FACTUAL ALLEGATIONS

### Duties Robinhood Owed to Customers as Broker Dealer

15.     Robinhood is a registered broker-dealer with the Securities Exchange Commission and a member of the Financial Industry Regulation Authority ("FINRA"). It offers self-directed securities brokerage services to customers through its website and smartphone applications.

16.     In March 2015, Robinhood began offering retail brokerage accounts to the general public, targeting young adults with little investing experience by promising "commission-free" and "discount" services. By November 2020, Robinhood had 13 million approved customer accounts. The average age of Robinhood's customers is 28-41, and many of them use Robinhood to make their first stock purchase.

17.     Robinhood owes a duty of loyalty to act in its customer's best interest and must satisfy a duty of best execution, which among other requirements, encompasses a duty to act exclusively in its customer's best interests and use reasonable diligence to execute a transaction in the shortest time possible, maximize the likelihood that the transaction is executed in its entirely and, where possible, seek price improvement to obtain the best price available. Fulfilling its duty of best execution requires Robinhood to perform regular and rigorous reviews of the quality of its customer order executions, which includes comparing and benchmarking its execution quality against competitor broker-dealers to determine whether it is

obtaining the best terms reasonably available for customer orders. When Robinhood receives a trade order from a client and routes the order to a venue for execution, it must fulfill its duty of loyalty to act in its customers' best interest and it duty of best execution.

18.     Robinhood does not send its customer orders to national exchanges; rather, Robinhood routes its customers' orders to Robinhood Securities for clearing and further routing to principal trading firms. Then, these principal trading firms attempt to profit from executing large volumes of retail buy and sell orders either by taking the other side of customer orders and exiting the positions at a profit, also known as "internalization," or by routing the orders to other market centers.

19.     Principal trading firms offer incentives to retail broker-dealers, such as Robinhood, to send them orders. One such incentive is "payment for order flow," defined in Rule 10b-10(d)(8) of the Securities Exchange Act of 1934 ("the Exchange Act") to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders. Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers, has received payment for order flow in exchange for routing its customer orders to principal trading firms. SEC rules permit the receipt of payment for order flow by broker-dealers as long as it does not interfere with the efforts of broker-dealers to obtain best execution, and as long as the routing of that order flow, and a description of all terms of any such arrangements that may

influence the broker-dealer's order routing decision, are disclosed in quarterly reports filed pursuant to Rule 17 C.F.R. § 242.606 ("Rule 606").

20.    Another incentive that principal trading firms may provide to retail broker-dealers is "price improvement" on customer executions. Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing on the public quotation feed. In other words, a price improvement occurs when executing a "buy" order at a price lower than the lowest prevailing offer or executing a "sell" order at a price higher than the highest prevailing bid. Price improvement creates a financial benefit for the customer, since the customer receives a better price than he or she would have received had the order been executed at the national best bid and offer ("NBBO") on the public quotation feed. In practice, most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

21.    PFOF, unlike price improvement, has the potential to create a conflict of interest between the broker-dealer and its customer because payment for order flow is a benefit that goes to the broker-dealer itself, whereas other incentives that may be obtained for routing order flow, such as price improvement, benefit the broker-dealer's customers. Robinhood's duty of best execution, accordingly, requires it prevent PFOF from interfering with its efforts to secure the most favorable execution prices and trade terms.

22.     During the Class Period, Robinhood negotiated PFOF arrangements with principal trading firms that significantly reduced the price improvement its customers received. Robinhood did not disclose its PFOF and the adverse effect the payments had on the price improvement customers received. Instead, Robinhood misrepresented that its execution quality and speed exceeded those of other brokerages.

### Robinhood's Extortionate PFOF Arrangements

23.     Initially, Robinhood relied on another broker-dealer to provide both clearing and order execution services for Robinhood customer orders. That broker-dealer routed Robinhood customer orders to principal trading firms, received PFOF in return, and shared a portion of that PFOF flow with Robinhood.

24.     During the first half of 2016, Robinhood decided to start routing customer orders through Robinhood Securities directly to principal trading firms and cease relying on the other broker-dealer for order execution routing services. By doing so, Robinhood could earn additional payment for order flow revenue.

25.     In or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities. During those negotiations, certain of the principal trading firms told Robinhood that there was a trade-off between PFOF on the one hand and price improvement on the other: if Robinhood negotiated for higher PFOF, according to

the principal trading firms, there would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

26.   Robinhood was also told, by at least one principal trading firm, that large broker-dealers that receive PFOF typically receive four times as much price improvement for customers than they do PFOF themselves – an 80/20 split of the value between price improvement and PFOF. Nonetheless, Robinhood negotiated the exact opposite split, with only 20% going to its customers and 80% going to directly to it in the form of PFOF.   In mid-2017, when one of the principal trading firms to which Robinhood routed order flow informed Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates and pay a lower PFOF rate, Robinhood stopped routing customer orders to that principal trading firm.

27.   Robinhood's acute focus on obtaining the highest PFOF interfered with its duty of best execution. *See* Battalio, *et al.*, Can Brokers Have it All? On the Relation between Make-Take-Fees and Limit Order Execution Quality, Dec. 15, 2013, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2367462 (last February 1, 2021); see also *Schwab v. E\*Trade Fin. Corp.*, 258 F. Supp. 3d 418, 427 (S.D. N.Y. 2017) ("a broker-dealer's focus on obtaining the highest amount of PFOF tends to interfere with best execution"). As noted at a hearing before the Permanent Subcommittee on Investigations of the Senate's Committee on Homeland Security and Governmental Affairs by Joseph Brennan, the Vanguard Group's Head

13

of Global Equity Index Group, some broker-dealers, like Vanguard, do not accept order flow payments because of the inherent conflict of interest that such payments automatically produce. *See also* CFA INSTITUTE, Payment for Order Flow, Internalisation, Retail Trading, Trade-Through Protection, and Implications for Market Structure, July 2016, available at https://www.cfainstitute.org/-/media/documents/issue-brief/payment-for-order-flow.ashx (last visited Jan. February 1, 2021) (PFOF effectively banned by UK Financial Services Authority because it "creates a conflict of interest in brokers' best execution obligations to their clients"); UK FINANCIAL SERVICES AUTHORITY, Finalised Guidance on the practice of 'Payment for Order Flow,' May 2012, available at https://www.fca.org.uk/publication/finalised-guidance/fg12-13.pdf (last visited Jan. 15, 2021) ("PFOF arrangements create a clear conflict of interest between the clients of the firm and the firm itself. Therefore, it is unlikely to be compatible with … best execution rules").

28.     In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms using the 80/20 PFOF/price improvement split arrangement. Around the same time, Robinhood formed a "Best Execution Committee" to monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders. The Committee met at least once per month and included Robinhood's General Counsel. In 2017, Robinhood developed a proprietary routing algorithm designed to make the principal trading firms with

which Robinhood had arrangements compete for order flow by routing customer orders to the principal trading firm that provided the most price improvement for that stock over the last 30 days. This routing algorithm, however, did not take into account Robinhood's high PFOF rates or execution prices that may be available at venues that did not agree to pay those rates. Thus, from October 2016 through at least June 2020, Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

29.     The Best Execution Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations. The Committee took no steps to determine whether Robinhood's high PFOF rates were having a negative impact on the execution prices that Robinhood's customers received. The Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally, until October 2018. In October 2018, the Committee learned that, for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's quality was worse than that of its competitors.

30.     By March 2019, Robinhood had conducted a more extensive internal analysis, showing that its execution quality and price improvement metrics were substantially worse than other retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price

improvement, measured on a per order, per share, and per dollar traded basis. The internal report stated "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin." And the margin widened the larger the order. For example, Robinhood learned that for most orders of more than 100 shares, customers would be better off trading at another broker-dealer, where they would get additional price improvement exceeding the $5 per-order commission costs those broker-dealers would have charged them. For orders over 500 shares, the average Robinhood customer lost more than $15 per order in price improvement compared to Robinhood's competitors. That loss rose to more than $23 per order for orders over 2,000 shares. As a result, between October 2016 and June 16, 2020, Robinhood orders lost over $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after the $5 per-order broker commission costs. In effect, for each trade executed during the Class Period, a better price was available and, but for Robinhood's conduct, Plaintiff and Class members would have received those better prices. Senior Robinhood personnel were aware of this analysis.

31.     Despite Robinhood's poor execution quality and price improvement, the Best Execution Committee did nothing to ensure Robinhood met its best execution duty. From October 2016 through June 16, 2020, when Robinhood had implemented all recommendations as required by a Letter of Acceptance, Waiver

and Consent entered into between Robinhood and FINRA, Robinhood failed to achieve best execution quality while at the same time making misrepresentations, omitting material information, and actively concealing its revenue sources and poor execution quality from its clients.

**Robinhood's Misrepresentations, Omissions, Concealment of Its Revenue Sources, and Poor Execution Policy.**

32.     In 2014, prior to its public launch, Robinhood published an FAQ on its website providing information about the company and its anticipated brokerage operations. The first version of the FAQ disclosed that Robinhood anticipated receiving PFOF in its answer to the question "How does Robinhood make money?" After Robinhood published the FAQ page, however, Robinhood removed the PFOF discussion from its FAQ discussion in December 2014 after media sources began criticizing PFOF. Robinhood then moved this discussion to a separate page dedicated to PFOF. This new FAQ page stated that the PFOF revenue Robinhood received at the time was "indirect" and "negligible." The new FAQ also stated if PFOF ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page.

33.     By the end of 2016, Robinhood was generating a significant amount of revenue and it knew that the majority of that revenue (more than 80%) came from PFOF. However, contrary to what the company originally said in its PFOF FAQ, it

did not disclose this to its customers, either on its website or through its customer service agents who it uniformly instructed to "avoid" talking about PFOF and it was "incorrect" to identify PFOF in response to customer inquiries regarding how Robinhood makes money. Robinhood also did not revise its customer agreements, which simply stated "[t]he nature and source of any payments or credits received by Robinhood in connection with any specific transactions will be furnished upon written request." Instead, Robinhood removed all mention of PFOF from it website at some point in 2016.

34.     Robinhood did, however, update its FAQ page in 2016 and 2017 to disclose two other, smaller revenue sources: subscription-based memberships and interest on securities lending. The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated: "Robinhood earns revenue by collecting interest on the cash and securities in Robinhood accounts, much like a bank collects interest on cash deposits." And when customers directly asked about Robinhood's revenue, they were given false, misleading, and incomplete information, as Robinhood instructed its customer service agents to direct customers to, and respond using, the language on the FAQ page, which failed to mention that PFOF was one of the company's revenue sources.

35.     When Robinhood negotiated its 80/20 PFOF arrangements, it did not disclose to its clients that it had agreed to accept less price improvements that what

the principal trading firms were offering in order to receive a higher rate of PFOF for itself.

36.     Robinhood, however, did disclose some information about its PFOF revenue as required in SEC-mandated reports pursuant to Rule 606, which it posted on the "Disclosure Library" page of its website along with other legally-mandated disclosures. However, Robinhood did not feature the "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page. Retail customers are not likely to have seen this information or understood it.

37.     Further, Robinhood did not disclose the percentage of its revenue from PFOF arrangements, their negative effect on the price improvement realized for its customers' trades, and the resulting poor execution quality. Instead, Robinhood hid these material facts from its customers, as Robinhood's new FAQ page stated Robinhood's "execution quality and speed matches or beats what's found at other major brokerages[,]" despite Robinhood's knowledge that its execution quality was significantly inferior to that of its competitors. Robinhood did not remove this claim until June 2019 after the Security Exchange Commission's Office of Compliance Inspections and Examinations raised concerns about it, but its failure to fulfil its duty of best execution throughout the Class Period.

## CLASS ALLEGATIONS

38.     Plaintiff seeks relief on behalf of himself and as a representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3), Plaintiff seeks certification of a Nationwide class defined as follows:

> All persons who used Robinhood's brokerage services between September 1, 2016 and June 16, 2020 to place investment orders in connection with which Robinhood received payment for order flow (the "Class").

39.     In the alternative, Plaintiff seeks certification pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3) of a California-Only class defined as follows:

> All California citizens who used Robinhood's brokerage services between September 1, 2016 and June 16, 2020 to place investment orders in connection with which Robinhood received payment for order flow (the "Class").

40.     Excluded from the Classes are Robinhood and any of its affiliates, parents, or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

> Plaintiff hereby reserves the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

41.     The proposed Classes meet the criteria for certification under Rules 23(a) and (b)(3).

42.     **Numerosity**. Fed. R. Civ. P. 23(a)(1). The members of the Classes are so numerous that the joinder of all members is impractical. Robinhood had approximately 13 million user accounts in November 2020. Upon information and

belief, Plaintiff states that there are at least hundreds of thousands of Class members who have been damaged by Robinhood's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff but can be readily ascertained from Robinhood's records.

43.     **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Robinhood's misrepresentations and omissions discussed above are false, misleading, or reasonably likely to deceive;

(b) whether Robinhood violated the UCL and CLRA

(c) whether Robinhood's conduct constitutes breach of fiduciary duties and/or the duty of best execution; and

(d) whether Plaintiff and Class members are entitled to appropriate remedies, including damages and restitution.

44.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of other Class members. All claims depend on Robinhood's uniform course of conduct described herein, and any factual differences in individual Class members' claims are rooted in the same cause. Plaintiff's damages and injuries are akin to other Class members, all of those injuries and damages arise from Robinhood's uniform conduct, and Plaintiff seeks relief consistent with the relief sought by the Classes.

21

45.     **Adequacy.  Fed  R.  Civ.  P.  23(a)(4).**  Plaintiff  is  an  adequate representative  of  the  Class  because  he  is  a  member  of  the  Classes  he  seeks  to represent, he is committed to pursuing this matter against Robinhood to obtain relief for the Classes, and has no conflicts of interest with the Class members. Furthermore, Plaintiff's  counsel  are  competent  and  experienced  in  litigating  class  actions, including litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class members.

46.     **Superiority Fed. R. Civ. P. 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The paramount purpose of a class action mechanism is to permit litigation against any wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. The Classes are largely compromised of individuals  without  much  investing  experience,  not  large  institutional  investors. Thus, the damages suffered by Plaintiff and Class members are relatively small compared to the burden and expense required to individually litigate their claims against  Robinhood,  and  therefore  individual  litigation  to  redress  Robinhood's wrongful  conduct  would  be  impracticable.  Individual  litigation  by  each  Class member would also strain the court system, increase the delay and expense to all parties,  and  create  the  potential  for  inconsistent  or  contradictory  judgments.  By contrast,  the  class  action  device  presents  far  fewer  management  difficulties  and

provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

47.     Unless a Class is certified, Robinhood will retain monies receives as a result of its conduct that were undertaken from Plaintiff and Class members.

**COUNT I**
**Violation of the Consumer Legal Remedies Act – Cal. Civil Code §§ 1750 *et seq.***

48.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

49.     Plaintiff brings this cause of action pursuant to the Consumer Legal Remedies Act, California Civil Code §§ 1750, et seq. (the "CLRA").

50.     Plaintiff is a "consumer" as defined by the CLRA § 1761(d). The securities at issue are "goods" as defined by the CLRA § 1761(a). Robinhood's services are "services" as defined by the CLRA § 1761(b).

51.     By use of the false and misleading statements and omissions set forth herein, Robinhood violated the CLRA by engaging in the following practices proscribed by the CLRA § 1770(a) in transactions with Plaintiff and Class members which were intended to result in, and did result in, the sale of securities and services:

> (5) Representing that goods or services have . . . characteristics, . . . [and] benefits . . . that they do not have . . . ;
> (7)  Representing that goods or services are of a particular standard, quality, or grade . . . [when] they are of another

(9) Advertising goods or services with an intent not to sell them as advertised;

(13) Making false of misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions;

(14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve; and

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

52.    Pursuant to § 1782(d) of the CLRA, Plaintiff and Class members seek a Court order for injunctive relief, and reserve the right to amend the Complaint for an order seeking damages under § 1782.

53.    Robinhood's conduct is fraudulent, wanton, and malicious.

54.    Pursuant to § 1780(d) of the CLRA, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT II
### Breach of Fiduciary Duty

55.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

56.    As providers of financial services and registered securities investment dealers, Robinhood was a fiduciary to Plaintiff and Class members, and owed them the highest good faith and integrity in performing financial services and acting as securities brokers on their behalf.

57.     Plaintiff and Class members placed their trust and confidence in Robinhood to handle their investments, which Robinhood accepted, thereby creating a fiduciary relationship giving rise to certain fiduciary duties, including but not limited to those duties described in its Customer Agreements and those imposed as matter of law, including: the duties of undivided loyalty, to refrain from engaging in unfair transactions, to fully disclose all material facts, to refrain from obtaining or accepting any advantage over Plaintiff and Class members, and to act in accordance with its duty of best execution.

58.     Robinhood also maintains discretionary control over customer accounts, thus assuming all the fiduciary responsibilities associated with its discretion to exercise trades and other transactions with or without customer direction.

59.     Robinhood breached its fiduciary duties to Plaintiff and Class member by, *inter alia*, failing to provide best trade execution quality by prioritizing its profits through PFOF at the expense of the price improvements otherwise available on its customers' trades.

60.     Robinhood's conduct has caused Plaintiff and Class members harm, loss, and damages in an amount to be determined at trial.

**COUNT III**

**Violation of Business & Professions Code §§ 17200, *et seq.***

61.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

62.    Plaintiff brings this cause of action pursuant to California's Business & Professions Code §§ 17200, *et seq.* (the "UCL")

63.    The UCL prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Professions Code § 17500.

64.    Robinhood has committed business acts and practices that violate the UCL by breaching its duties of best execution, undivided loyalty, good faith, and to refrain from unlawful conduct including disseminating unlawful, unfair, deceptive, untrue, and misleading advertising in connection with its sale of securities brokerage services, as described herein; and violating the various laws asserted herein.

65.    The conduct of Robinhood as alleged above also constitutes unfair competition in that the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

66.    Plaintiff and Class members have suffered injury in fact and lost money or property as a result of Robinhood's conduct because they engaged in a broker-client relationship with Robinhood in reliance on the materially false and misleading

statements and omissions, which they otherwise would not have done, and placed trade orders which they otherwise would not have placed, which received inferior execution quality compared to the prices available on the market through other brokerages. For each of Plaintiff and Class members' trades executed during the Class Period, a better price was available than the price they received through Robinhood and, but for Robinhood's wrongdoing alleged herein, Plaintiff and Class members would have received those superior prices.

67.     Plaintiff and Class members are entitled to restitution and all other relief this Court deems appropriate, consistent with the UCL § 17203.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment:

(a)     Certifying the Classes as requested herein;

(b)     Awarding damages, restitution and disgorgement of Robinhood's revenues to Plaintiff and Class members;

(c)     Awarding attorneys' fees and costs; and

(d)     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

DATED:  February 3, 2021            Respectfully submitted,

                                    **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

                                    s/ Rebecca A. Peterson
                                    Robert K. Shelquist, MN #21310X
                                    Karen H. Riebel, MN #0219770
                                    Rebecca A. Peterson, CA #241858
                                    Stephen M. Owen, MN #0399370
                                    100 Washington Avenue South, Suite 2200
                                    Minneapolis, MN 55401
                                    Telephone:  (612) 339-6900
                                    Facsimile:   (612) 339-0981
                                    rkshelquist@locklaw.com
                                    khriebel@locklaw.com
                                    rapeterson@locklaw.com
                                    smowen@locklaw.com

                                    Leo Kandinov, CA #279650
                                    **BARR LAW GROUP**
                                    501 W Broadway Suite 800
                                    San Diego, CA 92101
                                    Telephone: (619) 400-4966
                                    Leo@barrlaw.com

                                    **Attorneys for Plaintiff**